Lydia F. KOELLING, Orel Koelling and
Elinor Rae Koelling, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. No. 537.

United States District Court
D. Nebraska.

Feb. 14, 1957.

Edward L. Vogeltanz, Ord, Neb., for plaintiffs.

Donald R. Ross, former U. S. Atty., and William C. Spire, U. S. Atty., Omaha, Neb., and John N. Stull, Acting Asst. Atty. Gen., and Andrew F. Oehmann and M. Carr Ferguson, Attys., Dept. of Justice, Washington, D. C., for defendant.

DELEHANT, Chief Judge.

Plaintiffs instituted this action under Title 28 U.S.C. § 1346(a)(1), to recover in behalf of Lydia P. Koelling the sum of $435.65, and in behalf of Orel Koelling and Elinor Rae Koelling the sum of $403.32, with interest on each of such sums, as additional income tax for the year 1950, allegedly collected wrongfully. Defendant denies liability for all or any part of the sums claimed. The taxes involved arose out of the operations and returns of plaintiffs for the several years, 1950 and 1951, vide infra. In the interval embracing those years, and especially in 1951, plaintiffs Lydia P. Koelling and Orel Koelling were engaged in a partnership enterprise whose operations included the ownership of a herd of cattle used for breeding purposes. The partnership made for each of the years a partnership return of income. And for each of the years Lydia P. Koelling individually filed her own income tax return, and Orel Koelling and Elinor Rae Koelling, who were and are husband and wife, filed a joint return. Elinor Rae Koelling is sometimes identified simply as Elinor Koelling.

The complaint of plaintiffs contains allegations of the details of the operations, tax returns and tax payments of the parties and the returns of the partnership which defendant largely admits. To the extent that they are admitted, those allegations are set out in a footnote.[1] Plaintiffs' complaint also makes

---

1. For convenience in examination by counsel the admitted allegations of the complaint are set out with reference to the numbered paragraphs of the complaint in which they severally appear, as follows:

I. The action is brought under Title 28 U.S.C. Section 1346(a) (1). Plaintiffs are citizens of the United States and of the State of Nebraska and residents of Valley County therein. Orel Koelling and Elinor Rae Koelling are husband and wife and filed joint income tax returns for the years involved.

II. Lydia P. Koelling and Orel Koelling throughout the year 1950 were engaged in a partnership business and for that year filed partnership return of income. The profits from the partnership were carried to the individual income

several assertions that are denied by the answer. These include (a) the averment at different places, sometimes directly, sometimes by way of inference or implication, that their payments of taxes for the two years resulted in legally unwarranted overpayments whose recovery they seek; (b) sundry arguments, conclusions and assertions embodied in the claims for refund severally filed by plaintiffs; (c) the existence during 1950 and 1951 of a customary and usual practice among accountants and persons assisting taxpayers in the general area within which plaintiffs reside, including a local United States Internal Revenue Agent, whereby depreciation of depreciable property was computed in the general manner contended for by plaintiffs; (d) the assertion that the method of computing depreciation of cattle followed by plaintiffs conformed to Treasury Department Regulations III, section 29.23 (1)–5; (e) the employment by the partnership, from its erection and without earlier challenge by the Collector or Di-

tax returns of Lydia P. Koelling in the sum of $11,123.65 and of Orel Koelling and Elinor Rae Koelling in a like sum. For the taxable year 1950, Lydia P. Koelling paid an income tax to the Collector of Internal Revenue at Omaha in the sum of $1,849.72 and Orel Koelling and Elinor Rae Koelling paid an income tax in the sum of $746.60. (In the pleadings an immaterial difference is reflected touching the date of filing the partnership return, plaintiffs alleging it to have been filed on January 31, 1951 and defendant alleging it to have been filed on March 15, 1951).

III. Throughout the year 1951, the partnership persisted and for that year it made a partnership return of income showing a loss sustained by each partner in the sum of $1,515.80. The individual income tax return of Lydia P. Koelling for the taxable year 1951 showed a loss of $1,572.27 and the return for that year of Orel Koelling and Elinor Rae Koelling showed a loss of $2,277.03 (which last figure defendant asserts to have been $2,727.40).

IV. On July 29, 1952, plaintiffs Lydia P. Koelling and Orel Koelling filed an application for a tentative carry-back adjustment, Form 1045 under Section 3780 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3780, and thereafter tentative allowances were refunded to plaintiff Lydia P. Koelling in the sum of $395.97 and to plaintiffs Orel Koelling and Elinor Rae Koelling in the sum of $366.60.

V. Still later an audit was made by the Director of Internal Revenue of the partnership returns of income for 1950 and 1951, and upon such audit the District Director of Internal Revenue made a determination that the allowable livestock depreciation deduction was $4,569.84, instead of $7,804.22 as originally claimed by plaintiffs, thus resulting in a reduction of such depreciation to the extent of $3,234.38.

VI. Subsequent to said audit an assessment was made by the Director of In-

ternal Revenue against Lydia P. Koelling in the sum of $395.97 and on May 3, 1954 she paid that sum, plus $39.66 as interest, making a total payment of $435.65. Also an assessment was made against Orel Koelling and Elinor Rae Koelling for the sum of $366.60, and on May 3, 1954 they paid that sum, together with $36.72 interest, making a total payment of $403.32.

VII. On or about August 3, 1954, Lydia P. Koelling filed a claim for refund for the sum of $435.65 with interest from May 3, 1954, and Orel Koelling and Elinor Rae Koelling filed a claim for refund for the sum of $403.32 with interest thereon at 6% per annum from May 3, 1954.

VIII. On January 18, 1955, the District Director of Internal Revenue at Omaha disallowed the claims mentioned in the last preceding paragraph.

IX. The determination by the District Director of Internal Revenue of the amount of allowable livestock depreciation was based on a computation which took into consideration the probable salvage value of the animals upon and after the termination of the period during which they were to be usefully retained in the taxpayers' herd.

X. The language of Treasury Regulations III, Section 29.23(1)–5 is set out with some variety of selection therefrom, as between plaintiffs and defendant.

XIV. This action is brought by plaintiffs jointly for the reason that the cause of action, if any, arises out of the partnership return of income and the facts pertinent to the claim are identical as between the plaintiffs, except for the variations in the amount of the individual assessments necessitated by the individual tax accounting.

XV. On or about January 14, 1954, stipulation between the parties was entered into extending to June 30, 1955 the period of limitations upon assessment of income taxes against the plaintiffs for the taxable years 1951 and 1952.

rector, of the method of computing depreciation for which plaintiffs contend, from which they seem to argue that they acquired a right to continue so to employ it; (f) the conclusion that defendant is indebted to the several plaintiffs in the amounts in their behalf respectively prayed for, and (g) that the claims of the several plaintiffs are meritorious.

With the issues made by the complaint and the answer, the parties entered into, and filed, a stipulation in writing wherein they agreed "that this case shall be submitted to one of the judges" of this court, "for his decision upon the facts as set forth in this stipulation, and the pleadings as filed in this action, without any further evidence". The facts set forth in the stipulation, therefore, become vital. And, so far as it contains agreement upon facts unreservedly made, those facts are set out in a footnote,[2]

2. The strictly factual contents of the stipulation are these:

"1. This action is brought under the Constitution and laws of the United States, more particularly Section 1346 (a) (1) of Title 28 of the United States Code.

"2. The amount of the recovery which is herein sought is less than $10,000.00.

"3. Plaintiffs are citizens of the United States and residents of Valley County, Nebraska.

"4. Orel Koelling and Elinor Rae Koel-

ling, husband and wife, filed timely joint federal income tax returns for the taxable years here in dispute, and Lydia P. Koelling filed timely individual federal income tax returns for the same years.

"5. Orel Koelling and Lydia P. Koelling, his mother, filed a partnership tax return on May 15, 1951 for the year 1950 indicating they were in partnership in the operation of a farm located near Ord, Nebraska.

"6. That partnership returns for 1950 and 1951, timely filed, disclose the following:

| | "1950 | 1951 |
|---|---|---|
| "Ordinary net income (loss) | $22,247.30 | ($ 3,031.61) |
| "Distribution of net income (loss) Lydia P. Koelling (50%) | 11,123.65 | ( 1,515.80) |
| Orel Koelling (50%) | 11,123.65 | ( 1,515.80) |

"7. The individual income tax returns for 1951 disclose net operating losses for Orel Koelling in the amount of $2,727.-40 and for Lydia P. Koelling (after adjusting for a long-term capital gain) in the amount of $1,572.27.

. "8. In reporting that a loss was suffered by the partnership in 1951, the plaintiffs relied on a depreciation allowance on the farm's breeding stock computed on the partnership return as follows:

| "Property | Date Acquired | Cost | Estimated Life | Depreciation Allowance . |
|---|---|---|---|---|
| 82 cows | 1–1–51 | $ 21,179.15 | 6 yrs. | $ 3,529.86 |
| 80 cows | 2–1–51 | 20,800.00* | 6 yrs. | 3,055.56 |
| 1 bull· | 1–6–51 | 725.00 | 5 yrs. | 145.00 |
| 1 bull | 1–26–51 | 485.00 | 5 yrs. | 97.00 |
| 2 bulls | 2–9–51 | 1,620.00 | 5 yrs. | 297.00 |

 * The examining office found that the cost was $20,000.00 instead of $20,800.00.

| 1 bull | 2–14–51 | 500.00 | 5 yrs. | 85.00 |
|---|---|---|---|---|
| 1 bull | 2–21–51 | 485.00 | 5 yrs. | 80.00 |
| 5 milk cows | 1950 | 710.00 | 6 yrs. | 118.00 |
| Sub-total | | $ 46,504.15 | | $ 7,407.42 |
| 1 car | 9–50 | 3,978.00 | 5 yrs. (50%) | 397.80 |
| Grand Total | | $ 50,482.15 | | $ 7,804.22** |

* There is no dispute that the cost was $20,000.00 instead of $20,800.00 and that there was an error of $1.00.

** Error of $1.00 noted.

"9. The breeding stock itemized in the preceding paragraph was owned jointly by Lydia P. Koelling and Orel Koelling.

"10. That an audit was made by Rex D. Stark, internal revenue agent of said returns of Orel Koelling and Elinor Rae Koelling on or about November 14, 1952 and thereafter on December 3, 1952, D. V. Gordon, Director of Internal Revenue, approved said returns as filed. Photostatic copies of such approval by said Stark and Gordon are attached hereto as Exhibits 1 and 2, each consisting of three photostatic copies.

"11. That thereafter, the commissioner again reviewed the partnership return for 1951 and the examining officer for the Internal Revenue Service claimed that the probable salvage of the animals should be taken into consideration in computing the allowable annual depreciation thereon.

"12. Quotations on the Omaha Live Stock Market on December 31, 1951, as published in the Omaha World-Herald, were as follows with respect to the types of cattle involved:

| | Average |
|---|---|
| Cutters and canners (per cwt.) | |
| $16.50 @ 19.50 ............................ | $ 18.00 |
| Slaughter bulls (per cwt.) | |
| $24.00 @ 29.50 ............................ | 26.75 |

"13. The cows included in the taxpayers' breeding herd are held for that period during which they are capable of producing healthy calves. At the end of this period they are sold on the Omaha Live Stock Market for slaughter under the market designation of 'cutters' and 'canners'.

"14. The bulls included in the taxpayers' breeding herd are held for that period during which they are useful as breeders. At the end of this period they are sold either as breeders to other herd owners, in which case they bring a substantially higher price than they would if sold for slaughter, or, if the bulls cannot be sold as breeders, they are sold for slaughter on the Omaha Live Stock Market under the market designation of 'sausage' or 'commercial' bulls.

"15. By the standards existing December 31, 1951, the probable average weight of these animals when sold for slaughter is approximately eight hundred (800) pounds for cows and one thousand (1000) pounds for bulls.

"16. The cost of marketing the cows as 'cutters' and 'canners' and the bulls as 'sausage' bulls is one dollar per cwt.

"17. Applying the Omaha Live Stock Market quotations, contained in paragraph 12 above, and the average weights referred to in paragraph 15 above, the probable sale value of the cattle in question, at the time they became useless for their original purpose (disregarding market fluctuations) would be as follows:

| | Cows | Bulls |
|---|---|---|
| "Average weight | 800 pounds | 1,000 pounds |
| Average quotation on Dec. 31, 1951 | $18.00 per cwt. | $26.75 per cwt. |
| Less estimated disposition costs | 1.00 | 1.00 |
| Net | $17.00 | $25.75 |
| Per animal | 136.00 | 257.50 |

"18. At the close of 1951, the most reasonable estimate possible of the animals future sale value, with reference to facts in the preceding paragraphs, was $23,917.00.

"19. The 162 cows purchased on January 1, 1951 and February 1, 1951, had a useful life of six years when acquired.

"20. The Commissioner reduced the amount of the deduction claimed by the taxpayers for the depreciation on the live stock during 1951. This reduction resulted from the Commissioner's determination that the proposed sale value of the animals should be subtracted from their cost basis to arrive at their depre-

ciable basis. This determined decrease in taxpayers' deduction for depreciation during 1951 eliminated a net operating loss which the taxpayers had claimed in that year. Consequently, a net operating loss carry-back to 1950 was also eliminated. The elimination of the claimed net operating loss carry-back deduction in 1950 gave rise to the assessment and payment of the taxes, recovery of which is sought in this action.

"21. The Commissioner redetermined the depreciation allowance on the animals in question for the year 1951 as follows:

| "Property | Date acq. | Cost | Estimated Salvage | Balance | Est. Life | Depreciation Allowance |
|---|---|---|---|---|---|---|
| 82 cows | 1-1-51 | $21,179.15 | $11,152.00 | $10,027.15 | 6 yrs. | $1,671.19 |
| 80 cows | 2-1-51 | 20,000.00 | 10,880.00 | 9,120.00 | 6 yrs. (11/12) | 1,393.33 |
| 1 bull | 1-6-51 | 725.00 | 257.50 | 467.50 | 5 yrs. | 93.50 |
| 1 bull | 1-26-51 | 485.00 | 275.50 | 227.50 | 5 yrs. (11/12) | 41.71 |
| 2 bulls | 2-9-51 | 1,620.00 | 515.00 | | | |
| | | | | 1,105.00 | 5 yrs. (11/12) | 202.58 |
| 1 bull | 2-14-51 | 500.00 | 257.50 | 242.50 | 5 yrs. (11/12) | 44.46 |
| 1 bull | 2-21-51 | 485.00 | 257.50 | 227.50 | 5 yrs. | 37.92 |
| *5 milk cows | 1950 | 710.00 | 340.00 | 370.00 | 6 yrs. | 61.67 |
| Total | | $45,704.15 | $23,917.00 | $21,787.15 | | $3,546.36 |
| Amount claimed | | | | | | 7,406.42 |
| Revised adjustment | | | | | | $3,860.06 |

* 50% interest

"22. At no time prior to 1955 did the plaintiff's (sic) Lydia P. Koelling and Orel Koelling, claim a depreciation allowance upon the livestock held for breeding purposes; that at no time prior to 1951 did they own any livestock held for breeding purposes outside of a few milk cows, and prior to 1951 all their livestock was included on an inventory basis; that in years prior to 1951 they did claim depreciation on automobile and farm machinery without any allowances for salvage being deducted before depreciation on the same was taken.

"23. The taxes appearing as due on the face of plaintiffs' individual income tax returns for 1950 and 1951 were paid, and the refunds claimed on the face of the returns were made, including tentative refunds for 1950 based upon the claimed net operating loss carry-back for 1951.

"24. The amounts tentatively refunded for 1950 are based upon the loss carry-back for 1951 and were re-assessed under the provisions of Section 3780(c) of the Internal Revenue Code of 1939 pursuant to the determination of the Commissioner that estimated salvage value should be subtracted from the cost basis of the animals computing the depreciable basis of the animals.

"25. The plaintiffs filed timely claims for refund on August 13, 1954. True and correct copies of these claims for refund are attached to the plaintiffs' complaint as Exhibits 'A' and 'B' thereof and made a part hereof as though incorporated herein.

"26. The claims for refund referred to in the preceding paragraph were rejected by statutory notices of disallowance on January 18, 1955.

"27. This action was instituted within the time allowed by Section 3772 of the Internal Revenue Code of 1939 [26 U.S. C.A. § 3772] for the institution of such actions."

Briefly explanatory of paragraph numbered 10 of the stipulation, it should be noted that the first sheet of "Exhibit 1" attached to it is a photographic copy of a letter on a Treasury Department (Internal Revenue Service) form, having a typewritten signature, "D. V. Gordon, Director of Internal Revenue", bearing date December 3, 1952, making reference to "Income Tax year 1950" addressed to "Orel & Elinor Koelling, Ord, Nebraska", in this language:

"Upon examination of your income tax return for the year indicated above, the conclusion has been reached that it should be accepted as filed.

"I am sure you will appreciate that should subsequent information be received which would materially change the amount reported, it will be necessary under existing laws to redetermine your tax liability."

The other two of the "three photostatic copies" forming Exhibit 1 are:

(a) Photographic copy of taxpayer's copy, on Treasury Department form 885B, of "Report of Income Tax Audit changes for the year ended Dec. 31, 1950", bearing endorsement at the bottom of its single page "approved by John Jergeon" (name not certainly legible) "Reviewer 12–1–52 Examined by Rex D. Stout Int. Rev. Agt. 19 Nov. 1952". The body of this Report, so far as the form is completed contains the following:

"Taxpayer Orel & Elinor Koelling District Nebraska

"Address Ord, Nebr. Account No. 8002848

"Tax Computation—Supplement 'T' Table

| | | |
|---|---|---|
| "1. Corrected adjusted gross income from line 7, Form 885 C | | $4448.22 |
| "2. Corrected tax from table 3 exemptions (explain any changes) | | 380.00 |
| * * * * * * * * * * * * * | | |
| "15. Corrected tax from line 2, 9, or 14 | | 380.00 |
| "16. Less: Tax liability disclosed by return | | 746.60 |
| "17. Overassessment | | 366.60 |

Computation of Additional Tax or Overassessment

| | | |
|---|---|---|
| "18. Corrected tax liability from line 2, 9, or 14 | | 380.00 |
| "19. Less: (a) Tax withheld by employer(s) $ | | |
| (b) Payment(s) on estimated tax 1000.00 | | |
| (c) Previous assessment(s) | | |
| "Total $1000.00 | | |
| (d) Less: Previous refunds or credits | $620.00 | |
| "Net adjustments | | 380.00 |
| "20. Additional tax or overassessment | | None " |

———◆———

(b) Photographic copy of an unsigned instrument on Treasury Department Form 885C, the completed portions of which follow:

"Taxpayer Orel & Elinor Koelling

| | | |
|---|---|---|
| "Adjustments to Income | | Year ended Dec. 31, 1950 |
| "1. Adjusted gross income on return | | $6725.25 |
| * * * * * * * * * * * * * | | |
| "3. Total additions to income | | none |
| "4. Total | | $6725.25 |
| "5. Nontaxable income and additional deductions: | | |
| "(5a) Carry-back loss from 1951 | $2277.03 | |
| "6. Total deductions from income | | $2277.03 |
| "7. Adjusted gross income as corrected | | 4448.22 |
| * * * * * * * * * * * * * | | |

"Have prepayment credits been verified? Yes (x)

"Remarks: No agreement deemed necessary as taxpayer has filed Form 1045 & has received refund.

"Loss sustained in 1951 $5253.60 of which $2277.03 was operating loss to be carried back—No adj. necessary per sec. 122 I.R.C., 26 U.S.C.A. § 122, Taxpayer had kept very complete & accurate records. Depreciation is overstated approx. $20 which would have no effect on tax due as corrected.

"Most of income reported came from partnership return of Orel & Lydia Koelling & preliminary investigation indicates no further ver-

included in which is a brief summary of the material incorporated into paragraph 10 of the stipulation through photographic copies.

It may be understood that the court accepts and finds to be true the facts agreed to in the complaint and answer as reflected in footnote 1 and those embraced in the stipulation as copied into footnote 2.

In joining in the stipulation, defendant reserved, by its paragraph 28, an objection to each of its paragraphs 29, 30, and 31 on the ground of its asserted immateriality. In the interest of complete accuracy, those three paragraphs are set out in a footnote.[3] Since

ification necessary. A profit of over $22,000 was reported on this return for 1950."

The first sheet of Exhibit 2 incorporated into paragraph numbered 10 is similarly a photographic copy of a letter on an identical Treasury Department (Internal Revenue Service)* form in all respects identical with the copy of letter outlined and copied above in connection with Exhibit 1, except that it refers to "Income Tax year 1951". To it also are attached comparable data on forms 885B and 885C, the completed portions of which are copied as follows:

(a) From form 885B, bearing endorsement of approval and examination identical with that upon the like form in Exhibit 1:

"Taxpayer Orel & Elinor Rae Koelling District Nebraska

"Address Ord, Nebr. Account No. OE 85274

"Tax Computation—Supplement 'T' Table

"1. Corrected adjusted gross income from line 7, Form 885C, Loss $(5253.60)
"2. Corrected tax from table 4 exemptions (explain any changes) None

\* \* \* \* \* \* \* \* \* \* \* \* \*

"15. Corrected tax from line 2, 9 or 14 None
"16. Less: Tax liability disclosed by return None
"17. Deficiency or overassessment None

\* \* \* \* \* \* \* \* \* \* \* \* \* "

(b) From form 885C:
"Taxpayer Orel & Elinor Rae Koelling
"Adjustments to Income Year ended Dec. 31, 1951
"1. Adjusted gross income on return Loss $(2277.03)

\* \* \* \* \* \* \* \* \* \* \* \* \*

"6. Total deductions from income $(2976.57)
"7. Adjusted gross income corrected Loss (5253.60)

\* \* \* \* \* \* \* \* \* \* \* \* \*

"Have prepayment credits been verified? Yes —— No —— None claimed
"Remarks: Taxpayer had an operating loss & a loss from sale of machinery used in business ac/o called into army service. All income & expense was found to have been correctly stated and the operating loss of $2277.03 is an allowable carry-back to the year 1950. No adjustment per sec. 122 necessary.
"See verification of 1950 return—1040 No. 8002848
"(Loss on sale of farm machinery not used)"

3. Paragraphs numbered 29, 30 and 31 of the stipulation are in this language:
"29. That Rex D. Stark, Internal Revenue Agent located in Greeley, Greeley County, Nebraska, in 1951 and prior years assisted taxpayers in Valley County, Nebraska and adjoining counties in 1951, 1950 for some years prior thereto, in filling out and making their income tax returns; that at no time did said

Rex D. Stark as Internal Revenue Agent use any formula in depreciation of livestock and farm machinery whereby salvage was first deducted from the cost of such livestock.

"30. That if William F. Manasil, attorney, member of the firm of Manasil and Erickson, living at Burwell, Nebraska, was called to testify, he would testify as follows:

" 'I have for many years assisted farmers in the preparation of their income tax returns. During the years 1951 and 1952, I know that it was customary for the persons assisting farmers to take depreciation on breeding stock without first making any deduction for salvage.

" 'In the preparation of returns that I have made, this practice was followed and no salvage was first taken into consideration.'

"That if Emil R. Fafeita of the Ord Finance Company, Ord, Nebraska, was called to testify, he would testify as follows:

" 'I have for many years assisted farmers in the preparation of their income tax returns. During the years 1951 and 1952, I know that it was customary for the persons assisting farmers to take depreciation on breeding stock without first making any deduction for salvage.

" 'In the preparation of returns that I have made, this practice was followed and no salvage was first taken into consideration.'

"That if Arthur O. Auserod, Attorney and Counselor at Law, of Bartlett, Nebraska, was called to testify, he would testify as follows:

" 'My office handled 144 farmers and ranchers 1951 income tax returns and 161 farmers and ranchers 1952 income tax returns, most of which farmers and ranchers were residents of Wheeler County, Nebraska.

" 'In the Wheeler County, area, it was customary to not use salvage in figuring depreciation on breeding and dairy cattle during these two years, and when the cattle were sold the full depreciation take was returned in the proper space provided in Schedule "D" for the year in which the sale took place.'

"That if W. C. G. Noll, bookkeeper of the Ord Livestock Market of Ord, Nebraska, was called to testify, he would testify as follows:

" 'I was cashier for the First National Bank in Ord, Ord, Nebraska, for many years and have now been auditor for the Ord Livestock Company for several years. During this time, I have assisted farmers in the preparation of their income tax returns. In the years 1950 and 1951 and prior thereto, I knew that the custom of the auditors assisting with the preparation of income tax returns was to take depreciation on breeding stock without first making any deduction for salvage.

" 'This was the general custom of such auditors in Valley County, Nebraska, and as far as I know, adjoining counties.'

" 'In the preparation of the returns that were made by me, this practice was followed and no salvage was taken into consideration.'

"31. It is hereby stipulated that the plaintiffs have now disposed of all of the cattle involved in the dispute in this action and that the following is a statement of the year such cattle were bought, the year when such cattle were disposed of, of the sale price thereof and of the cost thereof:

| "Bought | | Sold | Sale Price | Cost |
|---|---|---|---|---|
| 2 cows | 1–15–51 | 1952 | $ 328.20 | $ 516.56 |
| 25 cows | 1– 1–51 | 1952 | 2,852.32 | 6,457.00 |
| 33 cows | 1– 1–51 | 1953 | 4,388.70 | 8,423.24 |
| 1 bull | 1– 1–51 | 1953 | 204.80 | 725.00 |
| 1 bull | 1–26–51 | 1954 | 134.40 | 485.00 |
| 1 bull | 2–14–51 | 1954 | 172.50 | 500.00 |
| 1 bull | 2–21–51 | 1954 | 172.50 | 485.00 |
| 7 cows | 2– 1–51 | 1954 | 728.47 | 1,750.00 |
| 16 cows | 2– 1–51 | 1954 | 1,580.02 | 4,000.00 |
| 1 cow | 2– 1–51 | 1954 | 70.04 | 250.00 |
| 1 cow | 2– 1–51 | 1954 | 99.71 | 250.00 |
| 22 cows | 1– 1–51 | 1955 | 2,527.26 | 5,782.20 |
| 55 cows | 2– 1–51 | 1955 | 5,143.05 | 13,750.00 |
| 1 bull | 2– 9–51 | 1955 | 194.00 | 810.00 |
| 1 bull | 2– 9–51 | 1955 | 188.98 | 810.00 |
| 5 milk cows | 1950 | 1955 | 483.90 | 710.00 |
| | Total | | $19,268.85 | $45,704.00" |

the factual truthfulness of the quoted material is agreed to, it is probably the better administrative course to receive in evidence the three paragraphs and, thereupon, to the extent that the court considers their facts to be immaterial, to make a declaration herein to that effect and in the final ruling to disregard the immaterial items. That may be understood as the action pursued by the court.

The submission now made to the court is agreed by counsel to present only a single narrow question. That is whether, in the computation of the depreciation of the cattle involved, the position of plaintiffs or that of defendant is correct, in other words whether in arriving at the initial base upon which depreciation is to be computed upon cattle for the year 1951, deduction should not (as plaintiff claims), or should (as defendant contends), be made from cost, of the unquestionably existing and anticipated "salvage value" which the cattle customarily possess after they have lived and served through the period of their usefulness in the taxpayers' herd as breeding stock. If this question is to be answered in the manner for which plaintiffs contend they are entitled to recover what they demand. The parties are not in controversy over the amount of the recovery, if any is to be allowed. But if it is to be answered after the manner of defendant's contention, plaintiffs may not have any recovery at all.

First encountered is the ruling respecting the matters contained in paragraphs numbered 29, 30 and 31 of the stipulation, footnote 3, supra. The stipulation agrees, and the court necessarily finds, that the facts there set out are objectively true. What is at stake is their materiality. Paragraphs numbered 29 and 30, on the one hand, and paragraph numbered 31, on the other, are to be classified and, in the appraisal of their materiality, are to be considered separately.

By paragraph numbered 29 it is agreed that through 1950 and 1951, and even before 1950, one Rex D. Stark, an Internal Revenue Agent located in plaintiffs' residential and operating area, within which he assisted taxpayers in preparing federal income tax returns, did not at any time use any formula in computing the depreciation of livestock, whereby in arriving at the depreciation base salvage value was first deducted from the cost of the livestock. By paragraph numbered 30 it is agreed that if each of two attorneys at law, a finance company associate, and a bookkeeper for a livestock market in the area, were severally called as witnesses, each would testify, in slightly variant language, to his preparation of a considerable number of federal income tax returns for farmer taxpayers, and that it was not the custom and practice in the area, in computing allowances for depreciation upon breeding livestock, first to make a deduction from cost of acquisition of any sum on account of estimated or computed salvage value of the animals (presumably, though the stipulation at this point does not directly state, at the termination of their estimated usefulness in the taxpayers' herds as breeding stock). As has been intimated, these two paragraphs have to do with a common subject matter.

The court is persuaded, and, therefore, finds and rules, that the facts set out in paragraphs numbered 29 and 30 (accepting the proffered testimony adverted to in number 30 as fairly reflective of facts in harmony with it) are wholly immaterial in this context. The fact that in the general area comprising the residence and operating location of a taxpayer a custom has grown up among taxpayers of computing income in a particular manner is neither controlling nor instructive in support of the taxpayer's observance of that custom in the preparation of his return. What matters is whether the method he employs is correct. Testimony of the sort tendered might easily have materiality if the issue were the good faith of the taxpayer

in his following of the method. But that is not the present question, which is rather the validity on its own account of the method itself. The court is, accordingly, uninfluenced in its ruling by paragraphs numbered 29 and 30 of the stipulation, or either of them.

■ Paragraph numbered 31 stands in a somewhat different plight. Without quoting it again or adequately summarizing it, observation is made that it reflects the cost and sale prices of 173 cows and bulls, of which five milk cows were bought in 1950 and sold in 1955 and all of the rest were bought in 1951 and sold in different groups and at different times through 1952, 1953, 1954 and 1955. From it plaintiffs appear to contend that the aggregate of the amounts thus received was somewhat less than the salvage value of the same animals computed by the government and deducted from cost in arriving at the depreciation base. The court does not declare that this evidence is wholly immaterial, but does conclude that it is not controlling in plaintiffs' favor. Many things conspire to deprive it of that consequence, among which are the want of a showing of the circumstances, and conditions and manner of the sales, beyond an allowable inference from plaintiffs' argument that they occurred under a measure of necessity, thus introducing the possible factor of distress into the sales; the spacing of the sales, and their occurrence generally, if not entirely, within the interval of the estimated useful life in the taxpayers' herd, of the cattle for breeding purposes rather than at or after its end. The evidence is accepted, therefore, as not wholly immaterial; but it is not accorded a controlling significance.

■ Plaintiffs do not appear to argue that the allowance of their respective claims for refunds in connection with their 1950 taxes based upon claimed net operating loss carryback for 1951, or the approval regarding returns of Orel Koelling and Elinor Rae Koelling reflected in paragraph numbered 10 of the stipulation and its attached exhibits, or both in combination, are operative to bar the defendant from resisting their present suit. If and to the extent that such a contention were, or may be thought actually to be made, it would be and is invalid. A sufficient ground of such invalidity would lie in the expressly tentative and reviewable character of the actions mentioned.

It is also shortly stated that of the several allegations of the complaint that are denied by the answer, vide supra, disposition is made in the manner now indicated. The argumentative assertion that the exaction from plaintiffs of the additional taxes for 1950 whose recovery is sued for was legally unwarranted is rejected, infra, in the disposition of the principal issue of the suit. The argumentatively asserted grounds for recovery presented in the claims for refund preliminary to suit are similarly rejected. The court does not agree with the plaintiffs' allegation, by way of conclusion, that their method of computing depreciation of their cattle conformed to Treasury Department Regulations III Section 29.23(1)–5. Nor does the court concur in their argumentative averment that their setting up of depreciation in returns antedating that for 1951 without former challenge by the government precludes the defendant from asserting the impropriety of the deduction claimed for the taxable year 1951. The record before the court does not support that position. Finally, the plaintiffs' conclusion that their claims are meritorious and that the amounts claimed are due to them respectively also fall, infra, with the disposition of the principal issue in the case.

■ Coming to the main issue, the court is satisfied that the position of plaintiffs assailing the deduction from the cost of the animals of their probable salvage value at the estimated close of their useful breeding periods in the partnership herd, to arrive at the basis on which depreciation is to be computed,

is demonstrably mistaken and not well taken. The facts respecting the duration of holding the cattle in the breeding herd, their possession, at the termination of that period, of a substantial salvage value, and the susceptibility to intelligent and practical computation from time to time of such salvage value are all fairly reflected in the pleadings and the stipulation. They need not, and will not, be repeated at length in the course of this ruling. It is to be remembered, first, that, for all of the animals, there is a ready and substantial though fluctuating, opportunity for sale at the fairly near Omaha livestock market whose probable results at the close of 1951 are intelligibly reflected in the stipulation. For some at least of the bulls that have served their more desirable interval in their own herd, it is also to be noted that an even higher value is frequently obtainable from other breeders who may use them for a while in new and different herds as breeding bulls.

In dealing with a cattle breeding herd, it is altogether unrealistic to insist on the complete exhaustion, through a depreciation allowance, of the investment in the herd over the fairly short period of the useful life of the animals as units of a single herd. The simple truth is that the useful life of an animal for that purpose is not at all the life of the animal itself. At the end of the period the cow or bull, as the case may be, still lives and has a substantial value that is determinable with reasonable certainty. What is exhausted in the way of depreciation during the useful breeding period is not the animal itself but its breeding serviceability in the herd. At the end of the period a real value survives, either in the open livestock market for sale by the hundred weight, or in a good many instances in the way of resale to other breeders. Under such circumstances the claim of right to deduct, through annual depreciation over the breeding life in the owner's herd, the entire cost of the cow or bull is unreasonable and not founded upon the prac-

tical operating conditions of the enterprise. That should be allowed for depreciation which is exhausted through the period; and it is the cost less the reasonably determinable value of the animals at its end, which latter item is characterized as salvage value.

The thought already suggested appears to be consonant with the applicable statute and regulation, to each of which brief reference may be made. By Section 23, Internal Revenue Code of 1939, as amended by Section 121(c) of the Revenue Act of 1942, 26 U.S.C.A. § 23, it is provided in part that:

"In computing net income there shall be allowed as deductions: * * *

"(l) Depreciation. A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * *

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

The statute does not provide an inflexible method or system of computing depreciation but appears clearly to allow its determination in such fashion as will conform to the circumstances of the depreciated property and the enterprise within and for which it is owned and used.

Section 29.23(1)–1 of Treasury Regulations 111 promulgated under the Internal Revenue Code of 1939 contains the following language:

"Sec. 29.23(1)–1. *Depreciation.* —A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business, or treated under section 29.23(a)–15 as held by the taxpayer for the production of income, may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from

exhaustion, wear and tear, or obsolescence. *The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis of the property determined in accordance with section 113. \* \* \*"* (Emphasis added.)

The reasoning supporting the allowance of depreciation was set forth in an undoubtedly distinguishable context in City of Knoxville v. Knoxville Water Company, 212 U.S. 1, 29 S.Ct. 148, 152, 53 L.Ed. 371, in this manner:

"A water plant, with all its additions, begins to depreciate in value from the moment of its use. Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original investment remains as it was at the beginning."

 It is generally accepted and recognized that for the determination of income taxes depreciation is to be computed upon, and in the light of, the realities of the particular depreciable property. Pittsburgh Hotels Company v. Commissioner of Internal Revenue, 3 Cir., 43 F.2d 345; Washburn Wire Company v. Commissioner of Internal Revenue, 1 Cir., 67 F.2d 658; Commissioner of Internal Revenue v. Mutual Fertilizer Company, 5 Cir., 159 F.2d 470; and that in arriving at such realities, they are to be measured by the facts reasonably existing at the end of each taxable year and not by facts that may be found actually to exist at some time thereafter. Commissioner of Internal Revenue v. Mutual Fertilizer Company, supra. Reasonably predictable conditions, not the certainties of "hindsight", are what is required.

There is, too, substantial judicial warrant for the consideration after the fashion insisted upon by defendant of the factor of "salvage value". United States v. Ludey, 274 U.S. 295, 301, 47 S.Ct. 608, 71 L.Ed. 1054; Cameron v. Commissioner of Internal Revenue, 3 Cir., 56 F.2d 1021, 1022, 1023. The reasonableness of such consideration obviates any possible incongruity in that attitude.

 Remembering that deductions from income, among which is to be included the element of depreciation, are allowable to a taxpayer in the discretion of the Congress, Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623, the court has to consider that the burden of establishing his right to such deductions in a given case rests upon the taxpayer. And, in the present instance, it is convinced that that burden has not been adequately sustained.

The prayer of plaintiffs is, therefore, being denied; and the complaint and this action are being dismissed with prejudice; and the costs are taxed against plaintiffs.

A judgment is being made and given accordingly.